## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD RODRIGUEZ,** | : | **CIVIL NO. 1:10-CV- 727** |
| | : | |
| **Petitioner,** | : | **(Judge Conner)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **B.A. BLEDSOE, et al.,** | : | |
| | : | |
| **Respondents.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This habeas corpus petition calls upon the Court to answer two questions regarding the application of the Second Chance Act, a 2008 federal statute designed to provide prison officials with greater discretion in assisting inmates in making the transition back into society by permitting prison officials to place inmates in Residential Re-entry Centers up to 12 months before they are released from custody.

First, we must determine whether a federal inmate who wishes to bring a habeas corpus petition based upon an alleged failure by prison staff to comply with the Act must first exhaust administrative remedies within the prison system. For the reasons set forth below, we conclude that exhaustion of these administrative remedies is a prerequisite to federal habeas corpus relief in this setting, and further find that

Rodriguez has failed to exhaust his administrative remedies, a failure which compels dismissal of this case.

Second, this Petition invites us to determine whether, and to what extent, the Second Chance Act gives federal inmates a substantive right to early release to a halfway house or other non-custodial setting as they near the conclusion of their prison terms. With respect to this question, we find, consistent with the vast majority of courts, that the Act does not create a specifically enforceable right to release at any particular time. Rather, it provides guidance to prison officials in the exercise of their longstanding statutory discretion concerning inmate placements, guidance that permits, but does not compel, earlier release to a residential setting for inmates. Accordingly, what the law requires is for prison staff to give each inmate individualized consideration for earlier residential release, but leaves that individualized assessment largely in the discretion of corrections staff. Thus, we find that the requirements of the Act are fully met here, where the evidence shows that the Petitioner received a carefully tailored and individualized assessment of his suitability for placement in a Residential Re-entry Center.

## II.    Statement of Facts and of the Case

### A.    Richard Rodriguez

Richard Rodriguez is a 42 year-old federal inmate, who was sentenced in 1993 to 168 months incarceration for distribution of heroin. (Doc. 6,  Ex. 1 , ¶ 4, Attach.4.) At the time of his conviction on these federal drug charges, Rodriguez was a criminal recidivist with multiple prior convictions for drug and robbery offenses. (Id.) Rodriguez also had a lengthy history of serious drug abuse. (Id. attach.5). While in prison, Rodriguez continued to persist in unlawful conduct involving drug possession, weapons possession, and assault. Indeed, Rodriguez has been disciplined approximately 25 times as a result of serious institutional infractions, many of which involved weapons, drugs and violent behavior. (Id. attach. 4) As a result of this incorrigible conduct, Rodriguez is currently housed in the Special Management Unit of United States Penitentiary, Lewisburg. (Id. ¶ 3) Rodriguez is presently scheduled for release on December 25, 2010. (Id.)

### B.    The Second Chance Act and BOP Implementing Guidance

While Rodriguez  was serving this federal  sentence, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates

in Residential Re-entry Centers (RRC) for as much as one year at the end of their prison terms to aid them in their readjustment into society. <u>See</u> 18 U.S.C. § 3624(c)(1).[1] While Rodriguez has been in federal custody the Bureau of Prisons has adopted a series of policies, practices and procedures which govern inmate placement and custody. (Doc. 6, Ex.1, Attach. 1-2.)  These policies, in part, speak to the issue of

---

[1]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624 (c).

Residential Re-entry Centers (RRC) placements of inmates in the year prior to their release dates.

These prison policies, which are attached to the response to this Petition, specifically direct that, as a result of the Second Chance Act: (1) RRC placements were increased to a maximum of twelve months; (2) RRC placement determinations are to be made on an individualized basis using the criteria set forth at 18 U.S.C. §3621(b); and, (3) sentencing court orders, recommendations or requests directing an inmate's placement in an RRC should be considered, but are not binding on the Bureau of Prisons.

The Bureau of Prisons policies governing implementation of the Act further specifically instructed prison staff that all "inmates must now be reviewed for pre-release RRC placements 17-19 months before their projected release dates," and set forth the five factors under 18 U.S.C. § 3621(b) which must be considered when determining RRC placement dates. (Id.) With respect to these factors, the memorandum stated, "the Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" (Id.)

Thus, prison staff were admonished that they "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum

of 12 months pre-release RRC placement." (Id., emphasis in original.) The guidance provided to prison staff further stated as follows: "While the Act makes inmates eligible for a maximum of 12 months pre-release RRC placements, Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less. Should staff determine an inmate's pre-release RRC placement may require greater than six months, the Warden must obtain the Regional Director's written concurrence before submitting the placement to the Community Corrections Manager." (Id.)

Therefore, the Bureau of Prisons policy guidance implementing the Act accomplishes three goals: First, it mandates consideration of 12- month residential re-entry center programs for all inmates. Second, while mandating this individualized consideration, the policy notes that for many prisoners "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less." Therefore, the policy contains a third critical component requiring Regional Director approval for RRC placements exceeding 6 months.

### C. Application of The Second Chance Act and Implementing Guidance to Rodriguez's RRC Placement

It is against this statutory regulatory and administrative background that prison officials considered an RRC placement for Richard Rodriguez. That consideration

began in the summer of 2009. As part of this process, on June 25, 2009, prison officials initially made an individualized determination that Rodriguez was not eligible for an early RRC placement due to his extensive disciplinary history, which showed numerous disciplinary charges for serious offenses such as possession of weapons and use of drugs.(Id. ¶ 9; RRC Consideration, Attach. 3.)

Following this initial assessment, on November 9. 2009, Walter Zegarski was assigned as Rodriguez's case manager. (Id. ¶ 10.) On January 24, 2010, during a subsequent program review, Rodriguez's Unit Team reached a more favorable view of his case, and decided to recommend an RRC placement for Rodriguez in the range of 0-60 days. (Id. ¶ 11; Institutional Referral for CCC Placement, Attach. 5.) As a result of this Unit Team review, Rodriguez was then approved for a recommendation for a 0-60 day RRC placement. (Id. ¶ 12; Institutional Referral for CCC Placement, Attach. 5.) The recommended time frame was expressly based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected that these five factors were applied to the personal circumstances presented in Rodriguez's case. Specifically, this recommendation was based on facts unique to Rodriguez, such as Rodriguez's extensive history of illegal drug use in and out of incarceration and his lengthy disciplinary record for serious offenses while incarcerated. The assessment also took into account Rodriguez's positive personal developments while in prison, including

the fact that he obtained his GED, attended a drug education class, and had completed limited programming classes. This assessment also specifically took into consideration Rodriguez's social history prior to incarceration, citing the fact that he was unemployed at the time of his arrest but had some employable skills, and that he has limited community ties. (Id.; Inmate Skills Development Plan, Attach. 4.)

Rodriguez has an RRC placement date of December 10, 2010, for an RRC facility in San Antonio, Texas. (Id. ¶ 13.) At the time of his approved RRC placement date, prison officials were informed that several factors that are unique and specific to Rodriguez would limit the duration of this RRC placement. In particular, Case Manager Zegarski was informed that due to the limited number of bed space for RRCs in the San Antonio area, and Rodriguez's prior gang affiliations, Rodriguez could only be given a 15 day placement. (Id. ¶ 14.)

### D. **Bureau of Prisons Grievance Procedures and Rodriguez's Failure to Administratively Challenge This RRC Placement Decision**

With respect to inmate concerns regarding RRC placements and other matters, the Bureau of Prisons has adopted a three-tiered administrative remedy procedure with respect to inmate complaints which is set forth at 28 C.F.R. § 542.10, et seq. As part of this grievance process, inmates should first present their complaints to staff, and staff are obliged to attempt to informally resolve any issues before an inmate files a

formal request for Administrative Remedy. Id. at § 542.13(a). At the second stage of this process, if an inmate is unable to informally resolve his complaint, the inmate may file a formal written complaint to the warden, on the appropriate form within 20 calendar days of the date on which the events which form the basis for the complaint took place. Id. at § 542.14(a). If the inmate's concern is not addressed to the inmate's satisfaction by the Warden's response, the inmate may then file an appeal to the Regional Director within 20 calendar days. Id. at § 542.15(a). Finally, if the inmate is dissatisfied with the Regional Director's response, that decision may then be appealed to the General Counsel (Central Office) within 30 calendar days from the date of the Regional Director's response. Id. The Regional Director then has 30 calendar days to respond and the General Counsel has 40 calendar days to address the inmate's concern. Id. at § 542.18.

As these regulations state: "The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own imprisonment." 28 C.F.R. § 542.10(a). Under this grievance process: "If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures." Id. at § 542.10(c). Furthermore, under these

procedures, no administrative remedy appeal is considered to have been fully exhausted until decided by the Central Office. 28 C.F.R. § 542, et seq.

Notified of this proposed RRC placement by prison officials, Rodriguez failed to fully exhaust this administrative remedies before proceeding to federal court. (Doc. 6, Ex.2, Doc. 7.) Rodriguez's failure to exhaust these remedies, since Rodriguez is thoroughly conversant with this administrative remedy process. Indeed, in the course of his incarceration, Rodriguez has filed seventeen administrative remedies since 1998. (Doc. 6. Ex. 2, Attach. 1 pp. 2-10.) Many of these administrative remedies related to the conditions of Rodriguez's confinement. For example, Rodriguez filed three remedies in 1998 pertaining to state time credits for his federal sentence. ( Id. pp. 2-3.) In 2002, Rodriguez filed one administrative remedy requesting information on why he was transferred. (Id. p. 3.) In 2005, Rodriguez filed two administrative remedies regarding pictures he had taken. (Id. p. 4.) In 2006, Rodriguez filed eight additional administrative remedies regarding his sentence and medical care. (Id. pp. 5-8.) In 2007, Rodriguez filed two administrative remedies concerning an orderly job and a DHO report. (Id. p. 9.) Furthermore, prior to filing this case, Rodriguez's most current administrative remedy was filed on August 10, 2009, when Rodriguez requested a re-evaluation on the decision to place him in the SMU. (Id. p. 10.) Rodriguez himself acknowledges this failure to fully exhaust his administrative

remedies in his pleadings, candidly conceding that he did not even begin this process of seeking administrative relief with respect to his RRC placement until April 1, 2010. (Doc. 7.)

### E.     Rodriguez's Habeas Petition

On April 6, 2010, Rodriguez filed this Petition for Writ of Habeas Corpus. (Doc. 1.) In his Petition Rodriguez challenges the prison's decision to deny him 12-month early release consideration under the Second Chance Act, arguing that the actions of prison personnel are arbitrary and inconsistent with the law. These issues have been fully briefed by the parties (Docs. 1, 6 and 7) and are now ripe for disposition. For the reasons set forth below, it is recommended that the Court find that Rodriguez has both failed to exhaust his administrative remedies, and has  failed on the merits of his Second Chance Act claims.

### III.   Discussion

### A.     The Exhaustion Doctrine  Bars Consideration of  This Habeas Petition.

In our view, Rodriguez's Petition suffers from fundamental procedural and substantive flaws.  At the outset, it is evident that the Petition should be dismissed on procedural grounds, since the Petitioner has failed to properly exhaust his administrative remedies within the federal prison system.

Although 28 U.S.C. § 2241 contains no express exhaustion requirement, "[o]rdinarily, federal prisoners are required to exhaust their administrative remedies prior to seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241." Gambino v. Morris, 134 F.3d 156, 171 (3d Cir.1998); see also, e.g., Callwood v. Enos, 230 F.3d 627, 634 (3d Cir.2000); Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3d Cir.1981). These exhaustion rules serve an important and salutary purpose. The United States Court of Appeals for the Third Circuit requires administrative exhaustion of a claim raised under § 2241 for three reasons: "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and, (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir.1996); see also Gambino, 134 F.3d at 171; Lyons v. U.S. Marshals, 840 F.2d 202, 205 (3d Cir.1988).

In this case, Rodriguez has not exhausted his administrative remedies, despite being well-aware of these remedies and procedures. The Petitioner's failures in this regard appear to have been persistent and repeated. Thus, at the outset he failed to timely seek informal relief from staff, the first step mandated by the Bureau of Prisons grievance procedure. Moreover, he has not further pursued his administrative avenues of relief, despite being fully informed of his administrative appellate rights.

With respect to habeas claims like those presented by here, which seek

placement in a residential setting under the Second Chance Act, it is well settled that

> Courts in the Middle District of Pennsylvania have consistently held that "exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates he will be unsuccessful in his administrative appeals before the twelve-month pre-release mark, which is simply a statutory maximum and not a mandate." See Malvestuto v. Martinez, 2009 U.S. Dist. LEXIS 78231, *9 (M.D.Pa. Sept. 1, 2009) (Conner, J.); Melchiorre v. Martinez, 2009 U.S. Dist. LEXIS 91137, *7 (M.D.Pa. Sept. 30, 2009) (Conner, J.); D'Alfonoso v. Martinez, 2009 U.S. Dist. LEXIS 90344, *6 (M.D.Pa. Sept. 30, 2009) (Conner, J.); Torres v. Martinez, 2009 U.S. Dist. LEXIS 70577 (M.D.Pa. Aug. 12, 2009) (Munley, J.); Miceli v. Martinez, 2009 U.S. Dist. LEXIS 71877 (M.D.Pa. Sep. 15, 2t008) (Rambo, J.)

Ross v. Martinez, No. 09-1770, 2009 WL 4573686, *3 (M.D.Pa. Dec. 1, 2009).

Rigorously applying these exhaustion requirements, this Court has consistently

rejected habeas petitions brought under the Second Chance Act where inmates have

failed to fully exhaust their administrative remedies. See, e.g., Lacy-Thompson v.

Martinez, No. 09-1320, 2009 WL 4823875 (M.D. Pa. Dec. 14, 2009); Ferris v. Holt,

No. 09-1465, 2009 WL 3260557 (M.D. Pa. Oct. 8, 2009); Drummond v. Martinez,

No. 09-1258, 2009 WL 3241851 (M.D. Pa. Oct. 5, 2009).

Because Rodriguez has not fully exhausted his available administrative relief

regarding the failure to consider him for transfer or community placement under the

Second Chance Act, and has not shown that the failure in pursuing administrative relief should be excused, this Court should, as a threshold matter, dismiss the Petition for failure to exhaust administrative remedies, without prejudice to the filing of a new § 2241 petition after the Petitioner fully exhausts appropriate administrative relief. See Lindsay v. Williamson, 271 F. App'x 158, 160 (3d Cir. 2008) (affirming summary dismissal of § 2241 petition challenging BOP's execution of sentence "[b]ecause the District Court could determine from the face of Lindsay's petition that he did not exhaust his administrative remedies, a prerequisite to suit"); Shoup v. Schultz, No. 09-0585, 2009 WL 1544664, at *4 (D.N.J. June 2, 2009); Breazeale v. Shultz, No. 09-2118, 2009 WL 1438236 (D.N.J. May 19, 2009) (same).

**B.    This Petition Fails on Its Merits**

In any event this Petition fails because Rodriguez has not carried his burden of establishing that this discretionary decision by the Bureau of Prisons violated any rights guaranteed to him by the Constitution or laws of the United States. Therefore, we recommend that this Petition be denied on its merits.

At the outset, it is clear that this Petition does not raise any concerns of a Constitutional dimension. Nor can Rodriguez rely upon Constitutional concerns to challenge this RRC placement decision since it is well established that the United

States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id.

Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, such as a Residential Re-entry Center, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427

U.S. at 242; <u>Bulger v. U.S. Bureau of Prisons</u>, 65 F.3d 48 (5th Cir. 1995); <u>Marchesani</u>

<u>v. McCune</u>, 531 F.2d 459 (10th Cir.1976).

Rather, Rodriguez's sole avenue for substantive relief lies through the Second

Chance Act itself. With respect to habeas claims premised on the Act, as we have

noted, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went

into effect. This Act contains several provisions which are designed to aid prisoners

in their transition back into society. For example, the Act authorizes the Bureau of

Prisons to place certain inmates in Residential Re-entry Centers for up to one year at

the end of their prison terms to aid their readjustment into society. <u>See</u> 18 U.S.C. §

3624(c)(1).[2]

───────────────────

[2]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent
practicable, ensure that a prisoner serving a term of imprisonment spends a portion
of the final months of that term (not to exceed 12 months), under conditions that
will afford that prisoner a reasonable opportunity to adjust to and prepare for the
reentry of that prisoner into the community. Such conditions may include a
community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be
used to place a prisoner in home confinement for the shorter of 10 percent of the
term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent
practicable, offer assistance to a prisoner during prerelease custody under this

While the Act promotes policies assisting inmates in reintegration into society, nothing in the Act is mandatory, and the Act does not compel the Bureau of Prisons to provide particular inmates with a specific community confinement or home detention placement. Quite the contrary, the statutory text makes it clear that prison officials retain their broad discretion in placing, housing, transferring and classifying inmates. Thus, 18 U.S.C. § 3624(c)(4) clearly states that the Act in no way restricts the broad discretion conferred upon the Bureau of Prisons under 18 U.S.C. § 3621 to make decisions on how best to house inmates, providing that: "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621." Section 3621, in turn, reaffirms the discretion of prison officials in this field to make appropriate prison placement decisions based upon five statutory factors set forth in 18 U.S.C. § 3621(b). [3] Similarly, while the

---

subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

[3]18 U.S.C. § 3621(b) provides:

(b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available

Second Chance Act amended 42 U.S.C. § 17541 to encourage the Bureau of Prisons

to examine early release and social re-integration for certain offenders, the Act

expressly reaffirms that decisions relating to which offenders may qualify for the

program involve assessments that rest in the sound discretion of the Bureau of Prisons.

See 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Indeed, as it relates to inmate community confinement decisions, the Second

Chance Act speaks directly to the discretion retained by the Bureau of Prisons in 18

U.S.C. § 3624(c)(1), which provides as follows:

---

penal or correctional facility that meets minimum standards of health and
habitability established by the Bureau, whether maintained by the Federal
Government or otherwise and whether within or without the judicial district
in which the person was convicted, that the Bureau determines to be
appropriate and suitable, considering-

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--
    (A) concerning the purposes for which the sentence to
    imprisonment was determined to be warranted; or
    (B) recommending a type of penal or correctional facility as
    appropriate; and
(5) any pertinent policy statement issued by the Sentencing
Commission pursuant to Section 994(a)(2) of title 28 . . . Any order,
recommendation, or request by a sentencing court that a convicted
person serve a term of imprisonment in a community corrections
facility shall have no binding effect on the authority of the Bureau
under this section to determine or change the place of imprisonment
of that person.

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions <u>may</u> include a community correctional facility.

18 U.S.C. § 3624(c)(1)(emphasis added).

The use of the word "may" in § 3624 (c), has led many courts to hold that the Act creates no absolute, enforceable legal right to a 12- month RRC placement for any prisoner. <u>See, e.g.,</u> <u>O'Hara v. Rios</u>, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); <u>McGee v. Thomas</u>, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009). Rather, what is required by the Act is a showing that the Bureau of Prisons engaged in an individualized determination of each inmate's RRC placement, using the statutory factors set forth in the law. <u>Smith v. Sanders</u>, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Moreover, in considering whether the Bureau of Prisons has properly exercised its broad discretion in this field, over the past year courts have frequently examined the Bureau of Prisons policy statements implementing the Act. These policies statements: (1) note that many inmates can be successfully re-integrated into society

in 180 days or less: and, (2) require regional director approval for 12-month RCC placements. Much recent litigation in this field has focused on the issue of whether this policy guidance violates the Second Chance Act by creating unwarranted institutional and bureaucratic obstacles to such 12-month placements. As to this issue, courts are divided.

The majority view, reflected in numerous trial court opinions, and in the only appellate court decision to have considered this issue, holds that the Bureau of Prisons' requirement of regional director approval, and the agency's stated view that many inmates can have their needs met  RRC placements of 180 days or less, do not violate the Act[4]. This view has twice been adopted by courts in this district. McDonald v. Obama, No. 10-379, 2010 WL 1526447 (M.D. Pa. April 15, 2010), adopting,

---

[4]See,e.g., Miller v. Whitehead, 527 F.3d 752,755-58 (8th Cir. 2008); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009)); Fleischi v. Outlaw, No. 09-79, 2009 U.S.Dist. LEXIS 99306 (E.D. Ark. Oct. 26, 2009); O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); Holland v. Bureau of Prisons, No. 08-3960, 2009 WL 2872835 (D.S.C. Sept. 2, 2009);  Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009); Yanucci v. Stansberry, No. 08-561, 2009 WL 2421546 (E.D.Va. July 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009); Sessel v. Outlaw, No. 08-212, 2009 WL 1850331 (E.D. Ark. June 25, 2009); Stanko v. Rios, No. 08-4991, 2009 WL 1303969 (D. Minn. May 8, 2009); Somerville v. DeWalt, No. 09-68, 2009 U.S.Dist. LEXIS 37454 (E.D. Ky. May 1, 2009); Snyder v. Angelini, No. 07-3073, 2008 U.S. Dist. LEXIS 86460 (E.D.N.Y. Oct. 27, 2008).

McDonald v. Obama, No. 10-379, 2010 WL 1526443 (M.D. Pa. March 15, 2010);
Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing
Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009))(Munley, J.)

Recognizing the broad discretion expressly conferred to the Bureau of Prisons
by statute, these cases consistently hold that the requirement of regional director
approval for 12-month RRC placements, and the various agency statements expressing
an institutional view that RRC placements of 6 months or less are generally adequate
for most inmates, do not violate the Act. Rather these policies simply reflect the
Bureau of Prisons' exercise of its discretion in implementing the Act, an Act which
provides that prison officials simply "may" use community corrections facilities for
up to 12 months to aid inmates in their return to society. Id. Therefore, these cases find
nothing fundamentally offensive about these agency policy preferences, provided that
each inmate receives the individualized consideration of this RRC placement called
for by the Act. Id.

Two cases take a different view. Krueger v. Martinez, 665 F.Supp.2d. 477
(M.D. Pa. 2009); Strong v. Schultz, 599 F.Supp.2d 556 (D.N.J. 2009). In Strong and
Krueger, the district courts found that: (1) the agency requirement of prior regional
director approval for 12-month RCC placements; coupled with (2) the agency's stated
position that "inmates' pre-release RRC needs can usually be accommodated by a

placement of six months or less", so restrict inmate access to the 12-month RRC programs permitted under the Second Chance Act that they constitute an abuse of discretion by the Bureau of Prisons. Id. In Krueger, the district court also went on to note another shortcoming in the agency's implementation of the Act, observing that in making its particular RRC placement the agency appeared to have failed to consider a statutory requirement under 42 U.S.C. § 17541 that the Bureau of Prisons use early RRC placements to create incentives for inmates to participate in educational programs. Krueger, 665 F.Supp.2d. at 484-86 . Citing these concerns, these two courts granted habeas petitions, but only permitted a very limited form of relief, directing the agency simply to reexamine its decision without taking into consideration the general agency policy guidance which the courts found to violate the goals of the Act.

While these two cases express this view with great force, it is recommended that the Court adopt the majority view in terms of its framework for analysis of this habeas petition. At the outset, imposing this heightened scrutiny to these prison placement decisions can create a legal and analytical dilemma for reviewing courts in terms of defining the proper scope of judicial review in an area committed to agency discretion. This dilemma is aptly described by the one of the leading decisions in this field, Miller v. Whitehead, supra, which succinctly identified the dangers which may arise if agency determinations regarding how to implement statutes concerning inmate prison

assignments which provide for the exercise of substantial discretion are not given due deference. As the Court noted:

> Taken to its logical conclusion, the argument advanced by the inmates would require the BOP to consider daily requests for transfer to an RRC from every inmate in a facility, and to deny such requests only after an individualized consideration of each inmate's request and the five statutory factors. We agree . . . that "Congress surely did not intend such a result." See Muniz v. Sabol, 517 F.3d 29, 36 n. 14 (1st Cir.2008). "Even if a statutory scheme requires individualized determinations, ... the decisionmaker has authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." Lopez v. Davis, 531 U.S. 230, 243-44(2001) (internal quotation omitted).

Miller, 527 F.3d at 757.

These dangers may not have been fully addressed by those two cases which have granted habeas relief, since neither court discussed Miller, the leading appellate court decision in this field, in reaching their conclusions.

Furthermore, we agree with the majority of courts which have considered this statutory text, that the Second Chance Act does not appear to have the type of legal force that Strong and Krueger suggest. While the Act authorizes 12-month RRC placements by the Bureau of Prisons, it does not mandate them. Instead, the Act expressly and repeatedly emphasizes that the Bureau of Prisons retains full discretion in identifying when and how inmates are placed at RRCs. See, e.g., 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Moreover, while we recognize the force of institutional inertia, and the fact that these policy prescriptions will restrict the number of inmates who receive this 12-month program, any exercise of discretion yields this result for some inmates, yet Congress expressly authorized the exercise of this discretion by the Bureau of Prisons when implementing this program. See, e.g., 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5). Furthermore, the requirement of regional director approval for 12-month placements in RRCs and limiting extended access to these programs is rationally related to one of the statutory factors which govern prison placements; namely, the allocation of limited available prison resources. See 18 U.S.C. 3621(b). Without centralized coordination of these placements, individual institutions applying guidance in different ways could quickly exhaust available inmate housing. Thus, the various competing demands for these placements is a factor which strongly cautions in favor of some centralized assessment of extended RCC placement requests.

Finally, while we agree with the Miller court that individualized assessments of specific RRC placement decisions is not a task well-suited for the courts, we also note that the broader question of the Bureau of Prisons' overall implementation of its discretion under the Second Chance Act is an issue which is more appropriately considered in some other forum. In that regard, the Act expressly calls for legislative

oversight of this process, mandating that the Bureau of Prisons prepare and submit to Congress annual reports documenting the way in which it exercises the discretion conferred upon it by Congress in this field. See 42 U.S.C. § 17541(d). While this Congressional oversight is not a reason to forego our responsibilities here, it is a factor which suggests that in fulfilling our responsibility we should focus on ensuring that each inmate receives the individualized consideration called for by the law, and we may leave the broader public policy assessment of how well prison policies meet Congressional expectations to another forum.

In short, adopting a view which calls for a particularized analysis and assessment of the wisdom Bureau of Prisons' policy guidance in the area of RRC placements could draw the courts into an individualized assessment of each inmate's case against the five statutory factors, a result we do not believe that Congress intended. Miller, 527 F.3d at 757. Moreover, many of these policies, and particularly the policy requiring centralized review of extended RRC placements, are rationally related to institutional needs that are expressly delegated to the Bureau of Prisons. Further, to the extent that there is a need to engage in an overall assessment of how these policies are being implemented, the Second Chance Act clearly contemplates that this review will be done primarily through Congressional oversight. Therefore, all of these statutory considerations weigh in favor of the majority view expressed by

the federal courts, which calls upon the courts to limit judicial review in this field to making an independent assessment that the Bureau of Prisons engaged in an individualized determination of each inmate's placement, using the statutory factors set forth in the law. Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Adopting this standard of review, we believe that the record of these proceedings shows that Rodriguez's request received individualized consideration at the prison. For example, on June 25, 2009, prison officials initially made an individualized determination that Rodriguez was not eligible for an early RRC placement due to his extensive disciplinary history, which showed numerous disciplinary charges for serious offenses such as possession of weapons and use of drugs.(Id. ¶ 9; RRC Consideration, Attach. 3.) Following this initial assessment, on January 24, 2010, during a subsequent program review, Rodriguez's Unit Team decided to make a more favorable recommendation and recommend an RRC placement for Rodriguez in the range of 0-60 days. (Id. ¶ 11; Institutional Referral for CCC Placement, Attach. 5.) As a result of this Unit Team review, Rodriguez was approved for a recommendation for a 0-60 day RRC placement. (Id. ¶ 12; Institutional Referral for CCC Placement, Attach. 5.) The recommended time frame was based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected that these five

factors had been applied to the personal circumstances presented in Rodriguez's case. Specifically, this recommendation looked to factors unique to Rodriguez, such as Rodriguez's extensive history of illegal drug use in and out of incarceration and his lengthy disciplinary record for serious offenses while incarcerated. The assessment also took into account Rodriguez's positive personal developments while in prison, including the fact that he obtained his GED and attended a drug education class. This assessment also took into consideration Rodriguez's social history prior to prison, citing the fact that he was unemployed at the time of his arrest but had some employable skills, and that he has limited community ties. (Id.; Inmate Skills Development Plan, Attach. 4.)

In any event, even if the Court embraced the more heightened standard of review adopted in Krueger v. Martinez, 665 F.Supp.2d. 477 (M.D. Pa. 2009), this particular placement decision would still appear to meet the requirements set by law. At the outset, it is evident that this decision involved a specifically tailored, and individualized, assessment of the needs of Rodriguez, an assessment that was thoroughly documented by prison officials at the institution. Finally, given Rodriguez's lengthy history of institutional misdeeds there are few positive incentives which he would be entitled to receive. Thus, the Krueger court's concern for fostering incentives for positive institutional behavior simply has no application to this

Petitioner, given his extensive record of institutional infractions. Therefore, regardless of the standard of review employed here, an assessment of the RRC placement decision in this case leads to the firm conviction that this decision represented an individualized assessment of the needs of this prisoner, which is all that the law requires, and all that an inmate can demand.

While we reach this result in this particular case, we note that prison officials have agreed that they "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement," (Doc. 6, Ex. 1, attach. 1, emphasis in original). We urge prison officials to remain mindful of the standards which they have set for themselves, and which Congress has set for them, as they ensure that all inmates understand that they are receiving an individualized assessment of their needs.

## IV. **Recommendation**

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28, United States Code, § 2241, IT IS RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue. The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: May 7, 2010